Okay, call the next case, please. Counsel, who we're going to argue, please approach and let us know who you are. Good morning, Your Honors. My name is Brian Reyna with the Office of the State Appellate Defender representing the appellant C.W. Okay. Good morning. I'm Assistant State's Attorney Ashley Kuzon on behalf of the people. Okay, we have read all the briefs and are familiar with your legal arguments and have looked at the record extensively. So how about 15 minutes aside, save some time for rebuttal, and if we unduly harass you with questions, we might give you a little extra time. Not that we're into unduly harassing, but it happens sometimes. All right. Thank you, Your Honor. May it please the Court. Your Honors, this is a case where police conducted a warrantless search of a private citizen's residence, even though they never asked the citizen for permission to enter his apartment, and even though the citizen, Nathaniel H., who is the appellant's stepfather, told police to hold on and tried to close the door on them twice. The search was illegal, and the evidence obtained from it should be suppressed. The warrantless search was conducted without consent, probable cause, or exigent circumstances. Regarding consent, the video evidence is clear. There was none. The video corroborates Nathaniel's testimony at the suppression hearing that he told police to hold on, that he opened the door just to crack, that he tried to close the door again. What about the foot? Now, there's a lot of talk here that the police put their – somebody put their foot in there to keep the door open. That's not out of the video, is it? Your Honor, Nathaniel's testimony that that happened is completely uncontradicted and not contradicted by the video. The video does not show the officer's foot. It's literally his foot. Right, it doesn't go below their knees. But what you do see, and it is, I believe, around 238 to 315 on the video. Right. What you do see is Nathaniel closing the door, and then the officer stepping toward it, and the door opening again. And on appeal, the State does not dispute that that testimony, that the officer's foot was in the door, is uncontradicted. The State concedes that point. You cite in your brief, People v. Kutlinski, where you talk about the fact that if Lackney's testimony is inconsistent with the video, it should carry no weight. That's your position, right? His testimony, right, not the video. The video, obviously, is the best evidence. No, his testimony. Right. Well, what about the opposite? What about Hunter's testimony that an officer's foot blocked the door? That's not consistent with the video. It is consistent with the video. It is not inconsistent with the video. I mean, it's not contradicted by the video. The video doesn't establish that an officer did not put his foot in the door. In fact, it suggests that he did. It may not be contradicted, but how is it consistent? By not contradicting the testimony. I mean, the testimony was that they put a foot in the door, and there are pieces of footage there that corroborate that, that suggest that that's what happened. I mean, you can actually see the officer approach the door and step toward it, and it opened on its own without Nathaniel pulling on it. So that's circumstantial evidence that corroborates the testimony. And it's your belief that there was no testimony by any police officer that he or she tried to keep the door open by sticking his or her foot in the way? Well, no, there was no testimony about that. The State, after Nathaniel's testimony, the State has the burden to prove consent. They very well could have called Officer Dalton to the stand and asked him to rebut Nathaniel's testimony, but chose not to, perhaps because it appears the officer put his foot in the door. I'm sorry. Go ahead. Does the fact that Mr. Hunter said that police officer blocked it with the foot and the judge is there listening to it, does that mean that the judge has to believe what Mr. Hunter said? Does the video make – I just want to make sure I understand your question. Does the video find the court believing Nathaniel's testimony? No, just in general. Is the court obligated to believe Mr. Hunter when he says that one of the police officers put a foot in to stop the door from being shut, that he was trying to close the door? Your Honor, the court is responsible for making credibility determinations. However, when those determinations are against the weight of the evidence, which in this case is uncontradicted testimony and corroboratory video evidence, those findings have to be overturned. It's a manifest weight of the evidence standard when we're talking about factual findings. Okay. But there's also testimony that the officers entered the apartment. Mr. Hunter knew that they entered the apartment. At no time did he say, hey, you, get out. I told you, hold on. He didn't do anything. They followed him through the apartment. He didn't stop them. He didn't say, I told you to wait. He didn't do anything to make them go away. They weren't threatening him. A few points on that, Your Honor. First, there's a case I cited in the brief. I believe it's Don that says, you know, it's not the citizen's burden to object. The state has to approve consent. And here, I don't think it's accurate to say that he didn't do anything that indicates a lack of consent. He tried to close the door two times. He said to hold on when the police were outside the apartment. When the police came in, he again told them to hold on. He kind of lifts his hands up at the beginning in what's, you know, either a clear or ambiguous signal that looks like a stop signal. You know, the state points to no actions that could even be considered ambiguously consenting to this entry. Didn't he walk them back to the bedroom where he was? Your Honor, the state mentions this in the brief. The other girl was hiding? This is just more evidence that Nathaniel was not consenting. Nathaniel, first of all, told the officers to hold on, testified what he would have gotten, wanted them to hold on so he could go get his daughter. When they came in, despite his instructions, he again told them to hold on and then turned his back on the officers and continued walking, never looked back at them, never motioned for them to follow him. And, you know, so him walking away from the officers, I don't think evidences consent in any way. Well, but he could have stopped them. I mean, they were following him. And he was, with very good credibility, the judge didn't find that he was threatened, even though he might have said he was intimidated a little bit. The judge didn't find that, based upon how he reacted. So, you see, if he meant hold on, meaning don't cross that line, he could have changed his mind. He didn't do anything about it. When your Honor says that he could have stopped them, I don't exactly know what you mean. If you're suggesting he could have physically stopped the officers, I think that that's a crime. Well, he could have said something. He doesn't say anything to them. He said to hold on, and then he told them to hold on again. And they did, so. Well, they didn't. They actually brushed right past him. If he didn't move, he would have had a physical confrontation with the officer. This isn't a case where a lot of the cases, the state sites, the police ask, you know, for permission to enter, and then there's some kind of body language indicating consent or acquiescence to the question. There's no question here. The police didn't ask anything. The only statement made was by Nathaniel, and he says to hold on. The state does not dispute now that that commonly means wait, stop. There's no way to interpret that phrase as come in or yes, you can search. All right. Well, let's talk about the other aspect of it, and that is exigent circumstances. Give me your, you know, best definition of what exigent circumstances are under the law. Under the law, if there basically are circumstances that justify a warrantless search, it could be permissible. What might justify a warrantless search is when an offender is armed and dangerous, and there is some kind of risk to somebody, perhaps the public, the offender themselves, a victim. Or evidence. Or destruction of evidence. It's just a factor. This evidence was eminently destructible, right? It could be eaten, consumable, right? Except for the bleach. I mean, the food portion could have been eaten, but there are also the plastic bags, the receipt, the bleach. And we have police officers surrounding this apartment. These girls can't leave. They can't get rid of this evidence. And on top of that, my client's father is there who was trying to cooperate with police, and I don't think we should assume that he would let them somehow destroy this evidence.  Police are surrounding the apartment. There's no risk the offenders can leave. There's no risk they can, you know, very little risk they could completely destroy this evidence. And the State's entire case was the identification testimony. So, you know, the State didn't need to introduce food or food receipts to prove this case. Their case was the eyewitness identification. So there's just no reason they couldn't have taken a few minutes to get a warrant. This isn't really just an identification case, though, because there was actual proof that the defendant had the food that was delivered. And as my colleague has pointed out, the food could be consumed. The packaging could be thrown away. Bleach could be thrown in the plants or the lawn. Nobody would see it. I mean, there was physical evidence. There was. Besides the eyewitness testimony. Right. I'm saying the eyewitness testimony was the strongest part of the State's case and their most critical evidence. And it wasn't at any risk of being. I mean, certainly the case couldn't have gone forward without the identification testimony or would have been significantly weaker with the food alone. And, again, when you say that the food could have been thrown away or the packaging, if it's thrown into a garbage can inside of the apartment, the police would still have access to it. If it's burned or something, the police can smell the fire going on. I mean, I think there's very little possibility that all of this evidence could have been destroyed. You'd still have the container for the bleach. But regardless, I think the important part is nobody's at risk of any harm here. These offenders are not armed and dangerous. The police know that at this point. They have the multiple officers there where they can actually leave officers guarding the apartment while they went to get a warrant. If one of the, for lack of a better word, I'll call it weapons, was bleach, which can cause serious harm, if the defendant had access to that, that would be a problem. Well, the police did know at this point that by the time they searched, they had already talked to the complainant. And at the end of the day, this was laundry detergent. It wasn't bleach. And they knew the condition the complainant was in. They could see that he was fine, basically, after he had had his eyes washed with water. They weren't burnt. You know, there was no, he wasn't taken to the hospital. He was still at the scene. He was okay. So, I mean, there's nobody, there's no reason to believe that they could have harmed anyone with bleach, particularly anybody outside of the apartment, any member of the public. Well, the police didn't know that until after his eyes were washed out. It was a little bit after the fact. While they started the search, they were still under the impression they were looking for something that acted like and smelled like bleach, which is dangerous. Right. I mean, they still had the conversation with the complainant. And also, hypothetically, if it were pure bleach, I don't think pure bleach inside of the apartment could have put anybody at risk outside of the apartment. And that's a big factor in considering, as in circumstances, the, you know, the risk to the public. What's the significance of the address difference here? Is it surprising to you that these girls who had no intention of paying for this food might put down the wrong address? The significance of the address to me is that it shows that there's no probable cause for the search.  Would they have probable cause to enter the building 7738 as opposed to 7734? I don't think so, actually, Your Honor. No, they would have then. I mean, we're talking about probable cause of the wrong building number was just one of the problems. Is that part of the argument that was presented at trial or that's presented to us here, that the police did not have probable cause to enter? Oh, absolutely, Your Honor, which is another factor. The other address. This is the 38? Yeah, the fake address, the one that they were luring him to. Okay, well, probable cause regarding the fake address wasn't litigated. I don't know if my client had really had standing to litigate that, but probable cause for the actual apartment was litigated and is a factor in determining exigent circumstances. And there was no probable cause. The police had the wrong building number. The statement's brief says this is the same building, that 7734, 36, and 38 are all part of the same building. I hope you accept our invitation to look at Google Maps and particularly the satellite view. You can see very clearly that 7738 is a different building than 7734 and 7736. Those two units are part of the same building. 40 and 38 are not. They're on either side of that building. Police also had the wrong floor, the wrong ages of the girls, the wrong number of girls were in the apartment. The fact that the vestibule area of the 34 building smelled like bleach, failed to distinguish it from the other buildings the officers had gone into, which makes sense because laundry detergent is going to be something that's common in any apartment building. And several of the apartments in this building were not even searched. So police end on top of that, won't even testify. Somebody admitted when the police got into the 34 apartment that he had no idea which apartment CW was in. So there were no statements introduced. When he got up to number six, Hunter said that there were, I think I have the quote here, two teenage girls who lived there, including a 16-year-old who was home. Right. He said his 16-year-old daughter was the only girl that was home. Police were looking for two girls who were 18 to 20 years old. So she did not match that description. 16 to 18, come on. I think 18 to 20, I mean, you're getting into adult territory where I think 16 is much more of a teenager. And regardless, we have one girl, two girls, the four, I mean, that one fact can't be looked at in isolation. The fact a 16-year-old girl lived in a building police didn't have any information about. A 16-year-old girl can look like an 18-year-old girl, and an 18-year-old girl can look like a 16-year-old girl, and a 16-year-old girl can look like a 20-year-old girl. I mean, come on. Well, then there's no point in getting any information from a citizen if everything can just. . . No, there's a point in getting information. This man was there doing his job, trying to drop off food that they were going to pay for. Yes. They didn't want to pay for it. They threw something in his face to try to harm him and try to get away with it. And the rest is, you know, jurisprudential history, or it's about to be. Okay. Well, Your Honor, police asked the complainant for the age of the offenders to give them a boundary of what they're looking for. So when he. . . if it's. . . if it doesn't matter, if he could have said 16 or 18 or 20 or maybe then 14, I don't know what the point in asking for that information is. You can ask for the information, but I'm just suggesting that it defies, you know, just reality, that somebody might think that somebody who is 16 looks like 18 or the converse. Right. Well, the police had not seen C.W. or the offenders at the time they knew that one 16-year-old girl was in the apartment. So, I mean, regardless, if Your Honor believes that the age was a factor that might have gone toward establishing probable cause, alone it can't establish probable cause because we still have the wrong building number, the wrong floor number, an admission that he had no idea what apartment this girl was in when he entered, the common bleach smell, the fact no resident gave any statement indicating this person was in this apartment, the fact that three other apartments were unsearched and it could have been in that apartment. If all of this had happened the day before, I think you'd have a really good argument on your hands, a much better argument on your hands. If the search had happened the day before? If the crime had happened the day before. The crime had happened the day before. In terms of exigent circumstances, okay, the fruits of the, there's no fruit here. It's carbohydrates and protein. But, you know, that would have been gone a day later, right? There wouldn't be exigent circumstances a day later. They'd need a warrant a day later, wouldn't they? Well, they needed a warrant that day. I mean, the day of the search, particularly regarding the lack of probable cause. And, again, if the state, you know, if that food evidence is gone, they can still prosecute this case. They don't need it. They have an eyewitness who identifies them as the people that did this. You know, the risk of the critical evidence being destroyed isn't there. And this just would have taken, you know, a few minutes to get a warrant. Then the whole case on the defense would be the eyewitness testimony and the inaccurate testimony about the ages as opposed to the, you know, the food, the receipt, the partially eaten food, et cetera. Well, that would have been a valid question for the jury. And it might not have gone that way, Your Honor, also, because if police actually followed the Fourth Amendment and did this search correctly and held on when Nathaniel told them to hold on and he retrieved CW, they could have possibly introduced a pre-arrest voluntary statement, which would have strengthened their case and, you know, eliminated their need to rely on what was ultimately a kind of conflicted identification. Okay. You can wrap up if you'd like. Thank you, Your Honor. We'd ask that you reverse the circuit court's denial of trial counsel suppression motion and vacate CW's conviction outright. Thank you. Ms. Cusa. May it please the Court, again, I'm Assistant State's Attorney Ashley Cusa on behalf of the people. This video is open to interpretation, and we know it. That's because this video shows Nathaniel saying one thing and doing another. And the juvenile court viewed this evidence and acknowledged that discord, but still made a factual finding based on Nathaniel's conduct, demeanor, and interactions with the officers that he was consenting to their entry in search of his home. But he did say twice to hold on, right? Yes, two times in the video he does say hold on. That's correct. So police, when somebody says hold on and then you acknowledge it means stop, that doesn't mean anything to police. So when somebody says hold on, police can keep on going. They just can ignore that. Is that okay? No. I agree that that is not okay, but I think we have to. And this video is so fast, so we really have to look at it frame by frame by frame. And I tried to outline that as best I could in my brief. So what we have here is when the officers originally knock on Nathaniel's door, he opens it ever so slightly and has the lights off inside of his home and is talking to the officers through this little gap in the door. And at that time as they're asking him questions and they find out that he has two teenagers, one who's home and they asked to speak to her, he says hold on, hold on. And at that time the officers don't, they do exactly what he said, they wait. They don't try to enter. Because he has that door almost closed, he has those lights off, he's made no affirmative, done nothing affirmatively to indicate to these officers that they are welcome into his home at that time. It's not until Lieutenant Lockney starts to approach the front door and says hello to Nathaniel that he opens the door wide, says hi, how you doing, and illuminates the lights inside of the home and steps to the side which allows Lieutenant Lockney to enter. At that point in time, Lieutenant Lockney explains to Nathaniel, we are investigating this crime that occurred right out in front of your building involving two teenage girls. You said that your 16-year-old daughter is home. Can we please speak to her? And he says, uh-huh, hold on, as he's turning and walking down the hallway of his apartment. So what Lieutenant Lockney understood that conduct to mean was that he was taking him to see respondent in response to his question. And I think what's interesting too is what we see later on in the video when Lieutenant Lockney asks Nathaniel if he can search his bedroom, expressly asks him if he can search his bedroom, Nathaniel says yeah, and in the very same way turns and begins guiding the officer into his bedroom. So what is important here in the question before this court today is whether the juvenile court's determination was clearly erroneous. And it's important that we look at this through that lens because at the trial level the people had to prove by a preponderance of the evidence that it was reasonable for these officers to believe that Nathaniel was consenting to the search. And the juvenile court made very clear in her ruling that based on Nathaniel's conduct and his interactions with the officer that she believed that the state proved he was consenting to the search of his home. So, again, it's just very important when we look at this case that we break down the video very closely, look at exactly what happened, and try to think was it reasonable for these officers based on all of this affirmative conduct to believe that they were being welcomed into the home. And it's the state's position that upon reviewing this video evidence that was a correct determination that the respondent has not met her burden at this point in time to prove that the juvenile court's finding was against the manifesto aid of the evidence. So I'd also like to point out that even if this court found the juvenile court's ruling was against the manifesto aid of the evidence, the facts here do not support the application of the exclusionary rule. And as you all know, the exclusionary rule is a judicially created remedy that prospectively protects the Fourth Amendment rights by deterring future police misconduct. And such police misconduct, as expressed by the United States Supreme Court, isn't simple, isolated negligence. This involves a deliberate or reckless or grossly negligent disregard for Fourth Amendment rights by the police. So here there's no evidence that the police engaged in any kind of flagrant misconduct. At the very most, these officers just misjudged Nathaniel's intent. And Lieutenant Lockney's testimony really underscores this point because he repeatedly expressed that he believed Nathaniel was inviting him into the home. And we know this is credible because the juvenile court, who's a neutral arbiter of fact, viewed this body camera footage and came to the same conclusion as did Lieutenant Lockney. So Lieutenant Lockney's subjective belief was, at the very worst, based on a misunderstanding, which is not deliberate, deterrable police misconduct that triggers application of the exclusionary rule. I'd also like to point out that the requested relief that Respondent has asked for in this case, which is outright reversal of her adjudication, is improper for a number of reasons. First, the admission of the alleged improperly admitted evidence in this case was harmless, where the victim here consistently and credibly described the offense and positively identified the responder as the offender at trial. And the victim's description of the offense and his in-court identification of the respondent are independent of the alleged improperly admitted evidence. We know this because the victim here had a very clear, a very close, and a very lengthy opportunity to view the respondent at the time the crime was committed. And to any extent that this Court doesn't believe that this record sufficiently establishes an independent basis for the victim's identification of Respondent, the proper remedy is not outright reversal. It's simply to remand the matter to the juvenile court for an attenuation hearing so that any other evidence relevant to the issue of identification can be brought before the trier of facts. And finally, outright reversal is improper where all of the evidence in this case, including the alleged improperly admitted evidence, proved the Respondent guilty beyond a reasonable doubt. And as you know, I recently filed a motion to cite additional authority with this Court. The Illinois Supreme Court in its Drake decision recently reemphasized this rule that retrial is the proper remedy whenever the evidence, including the improperly admitted evidence, is sufficient to sustain the conviction. So what Respondent is doing is asking this Court to do exactly what the Illinois Supreme Court has instructed us not to do, and that's to reverse her conviction by discount-counting the evidence that she claims was erroneously admitted. And if I may very briefly address the Kutlinski matter that you, Justice Lavin, discussed with counsel, I just wanted to point out that the facts of that case are drastically different than what we have before this Court. That case also involved video camera footage and is cited by the Defendant to argue that this Court should ignore Lt. Lockney's testimony claiming it was impeached by the video evidence. But in that case, the Defendant was charged with obstructing a peace officer for, according to this officer, yelling at the officer and refusing to get back in his vehicle. Well, when trial came and the dash cam footage revealed what actually transpired between the officer and this man and showed not only that the Defendant didn't yell and didn't refuse to get back in his vehicle, but that the officer actually dragged the Defendant out of his car and tased him. So in that case, the Court applied the appropriate standard of review and found that no rational trial or fact could have found proof beyond a reasonable doubt of obstructing a peace officer based on those facts. So unless there are any questions of this Court for all of these reasons and those stated in the People's Brief, we ask that you affirm the Respondent's adjudication and sentence. Thanks. Rebuttal. Your Honor, as the State conceded that it was not okay for police to ignore Nathaniel's statement to hold on, the video shows that Nathaniel never opened the door at all, more than a crack. Lowney's testimony was contradicted by the video as to what he believed the consent was based on. It shows that Nathaniel never said, welcome or follow me. To the extent Nathaniel consented to a search of the bedroom, it was involuntary because police had already ignored his multiple requests to wait and was, if not, limited in scope to the bedroom where no evidence was found. The State still fails to identify any gesture, evidence and consent. They erroneously rely on the Federal exclusionary rule in terms of their balancing test argument. If the search is illegal, the evidence has to be excluded in Illinois. And finally, regarding relief, we don't contest that if you remand this case for a new trial, it would not violate CW's right against double jeopardy. We're asking, though, for an outright reversal based on the absence of evidence to proceed and efficiency, such as in Don and Davis. Thank you, Your Honors. Okay. Thanks for the briefs and argument. As always, very well done by both sides. We will take the matter under advisement and an opinion or order we'll issue forthwith. Thank you.